Good morning, and may it please the court, Albert Lin on behalf of Appellant Antero Resources Corporation. I have with me, Jamie Chapman from Antero. Antero's appeal in this case boils down to three legal questions, each of which goes to whether the company properly calculated royalties under certain oil and gas leases. In my time today, I intend to focus mainly on the first two legal questions, because together they cover all but one of the leases at issue. I'll also address the West Virginia Supreme Court of Appeals' decision in Kellam, which issued after the briefing in this case completed. In short, that opinion is an almost self-consciously narrow opinion that reaffirms that Wellman & Taney remain good law in West Virginia, but we think it did little else. Notably, it expressly declined to provide any further guidance on what those opinions mean or require. So, turning to the first legal question, which is whether Wellman & Taney applied to market value leases as well as proceeds leases. I think the place to start with that analysis is that it's undisputed that Wellman itself created a new rule only for proceeds leases. You know, I had, I must have missed something, but I found the briefing by both parties to sort of chase down rabbit holes that we really didn't need to go down. We have, in this case, leases that are seven leases or six leases that have the settlement language. We have one that has the flat, and there's no dispute about that, what, Track H, whatever it is, and then we have the other leases which don't have the settlement language, and you guys agree that they're gross leases. So, really, the issue here are these two through seven leases which have the settlement language. Now, why do we need to go to Wellman & Taney to read that contract? I mean, clearly, what they say, very obviously, is that if you do not address post-production costs, then the presumption is that the lessee carries those, but here, it was addressed in the settlement agreements, and so now the question is, what do those settlement agreements mean? And I think they're pretty murky, and we can address that, but this whole discussion about Wellman & Taney still applies or doesn't apply, it's not relevant, is it? Because the contract here was, the leases were amended in 2015, and we're addressing that language. That's what we're looking at, right? Not quite, Your Honor. I think, so there are essentially three categories of leases. One of them is, as Your Honor points out, leases two through seven as modified by the settlement agreement, and that's the market enhancement clause that you referred to. That's for the settling plaintiffs. However, Your Honor, there's a group of non-settling plaintiffs to whom leases three, four, six, seven, and nine apply, and we don't agree that those are proceeds leases. I think everybody actually agrees that the unmodified versions of those leases for the non-settling plaintiffs are, in fact, market value leases. So that's why this question of Wellman & Taney in terms of whether it applies only to proceeds versus proceeds and market value is relevant. There is a... I'm confused. Two through seven are the leases that were addressed by the settlement, right? For the settling plaintiffs only, but there are actually some plaintiffs here who were not parties to the settlement agreement. Well, then they don't have that language, right? That is correct. They have the unmodified language. They have the unmodified language who preceded the settlement. That's correct, Your Honor. And all of those did not address who bears the post-production costs. That is correct, but they are market value leases in the sense that they say that the royalties are calculated based on the market value at the well or the prevailing price at the well, which is different as well. What's that got to do with the notion that the lessee has the duty to produce gas and to market it? And those are implied covenants. It has nothing to do with, I know Wellman excluded the limited application, but still the principle was that if you don't address it and you have a common law duty to produce and you have a common law duty to market the gas so as to make it meaningful, then you pay the cost. Now, you want to reverse that principle? No, Your Honor. So I think the way that we approach this is we think there was a couple of things. One, there was a background principle in place at the time that Wellman came in to be and Imperial Colliery, which is an opinion of this court that addressed the West Virginia leases, talked about market value leases as opposed to proceeds leases and used the acknowledge that the net back method, even though those leases did not specifically talk about post-production costs, that that is a way. It uses different words, and I have trouble even figuring out the difference between a proceeds and a market value because I assume that when somebody receives proceeds, he's received it at the market value at what he could pay. And the market value and what's paid, actually paid are probably the market price because the sale is the market. But that doesn't get, that doesn't address my question is if, let's call these the other leases, not two through seven. The other leases don't have this settlement language. The other leases don't address any post-production costs, right? That's correct. So the standard understanding that West Virginia seems to have, and I know in Wellman they announced that only as to proceeds, but the general understanding is that because there's a duty to produce gas and to market it, the lessee has that duty. The lessee has to pay, carries the cost of performing that duty. That's the underlying principle. And whether it, what they get paid for it or what the royalty is seems to me doesn't address that principle. That principle is basically the absence of a contract that address pre-production, post-production costs. There's a presumption that says the lessee has to carry them. Yeah, and if I may, where we disagree, Your Honor, is that we think Wellman announced this rule and it was a new rule. When you think they announced this rule for proceeds leases- I don't know if it's a new rule. They seem to recognize it. I mean, these leases have been going on for hundreds of years now or a hundred years or whatever it is. Your Honor, I don't think you can- So they clarified the principle. Now they did distinguish some states and they followed Colorado and understand all that, but that's a standing principle. And they did say, curiously, that we're only applying to proceeds leases because market value may raise some other issues. Yes, Your Honor. And I think if you look at Taney, it explains what some of those different issues are. And Your Honor, I think that, and I understand that the distinction can seem a little murky, but I think the distinction is, so proceeds leases talk about, they contemplate an actual sale. And when a sale occurs, you get a royalty based on the actual money received. The difference is the market, and there's potential confusion with respect to proceeds leases that doesn't arise with respect to market value leases. And I think there's a paragraph in Taney that explains this where they say, for example, if you have a lease that says gross proceeds at the well, so gross proceeds contemplates an actual sale. And what Taney says is in that situation, you don't actually know where the actual sale occurred. What if it occurred somewhere way downstream, but it still says gross proceeds at the well? That's confusing, right? It's contemplating a real sale, but the sale didn't necessarily occur at the well. That's why proceeds leases need this extra clarity. The difference is with a market value lease where it says a market value at the well, it's talking about this hypothetical value at a particular place. It doesn't contemplate an actual sale. So you don't have that same potential mismatch that Taney was talking about. So I think that's the reason why Wellman only says it with respect to proceeds leases because it's acknowledging and recognizing that when you're talking about an actual sale, and Judge Niemeyer, this is to your point, people would think, okay, there's a sale, and there were certain revenue that came from that sale. There really aren't any sales at the well. That's what they said. That's no longer the practice, right? Right, but as Imperial Colliery recognized, you can figure out what the market value at the well is, which again is a hypothetical value, even if there's no actual market at the well. And you do that by saying, here's where the sale was, here's the revenue that we got. So with respect to these other leases, what do you want us to say about those? Of course, Your Honor. Don't argue the point why. Just tell me what you want for those leases. What we would like you to say is to say that Wellman, according to its own plain terms, Taney and Kellum, all of which reaffirm that same syllabus point in the limitation of proceeds, that that rule and those requirements do not apply to market value leases. That doesn't help me because that doesn't help what you're doing. The question is, do you then get to assess the proceeds? We do. Why? Because don't you still have the duty to produce and to market? Well, because when you apply the plain text of those leases, which use terms of- They don't address post-production costs. I understand, Your Honor, but I think if Wellman doesn't apply, then you apply the rule that is discussed in Imperial Colliery where it says, and is also discussed in Leggett, in a part of Leggett that is still good law, that says the cut value at the well is something that can be determined by taking the sale price downstream and subtracting the cost that were incurred to get to that place. It's called the net back method, and that's how you figure out that hypothetical value. So what we would have you say, Your Honor, is one, Wellman and Taney, by their own terms, don't apply beyond proceeds leases, and for market value leases, which simply contemplate this hypothetical value, you apply the rule that was embraced in Leggett. All these other leases provide for royalties at market value at the well? The unmodified, well, we- Unmodified ones, the other. It's actually three, four, six, seven, and nine. The one I'm leaving out is five. We acknowledge, and no one disputes, five is a pure proceeds lease. So that's what we would say with respect to those, and that's why we've talked at length, Your Honor, to answer your original question about the distinction between market- So on these other leases that have that language, market value at the well, your argument is that at the well can be computed by working backwards from the ultimate sale price and subtracting the costs. That is correct, and we think that was recognized in Imperial Colliery, we think it's recognized in Leggett, and a part of that- Thank you, Your Honor. Thank you, Your Honor. And so, just to sort of conclude on that argument, we think Wellman is very clear when you look at the syllabus point, and syllabus points that this court well knows is how the West Virginia Supreme Court of Appeals sets forth its principles of law. It limits it to proceeds. That syllabus point has been reaffirmed verbatim again and again, and the reason for it, Your Honors, is what we discussed, that there is a confusion that may arise with respect to proceeds leases that does not arise with respect to market value leases. And so with that, I'll turn to the market enhancement clause, Judge Niemeyer, that you had mentioned. The district court, so the question, that is a pure- You call it market enhancement clause, but I say it's a little more complex than that. You're talking about a paragraph that was added to the leases by reason of the settlement. That is correct. Okay, and that's a contractual construction. It's about eight lines long, whatever, okay. Yes, Your Honor, and so that's the provision that for the settling plaintiff is what governs in these particular leases, and the question, because, and we conceded, is a proceeds lease. The question is whether it satisfies time. It's undisputed that prongs one and three are satisfied. The district court held as much, and that has not been contested before this court. So really, the only question is whether it satisfies prong two, which requires the identification of cost with particularity. The district court's problem with it was that she thought that the phrase other products was ambiguous, and we think there's a couple reasons why it nevertheless satisfies prong two, but we can turn straight to ambiguity. Your Honor, with respect, we don't think it's really that, we don't think it's unclear what other products covers. The question that the district court raised was, does other products include natural gas liquids, which is something that's made from gas? And we think if you, for two reasons. One, if you apply the doctrine of a just in generis, which is how you construe catch-all clauses, as well as looking at the plain language that uses the different words products and form, I think what we think, it's clear that other products is talking about things that are like oil and gas, but not forms of oil and gas. And we think that's- Yeah, you know, you guys try to distinguish between costs of immediate production from raw gas at the well. You talk about how you produce, get to natural gas liquids. You mix all these things in, you say one's an enhancement and one's a post-production cost. You talk about when they get at marketable form. In other words, that's the defining period when the gas gets at marketable form, but gas is sold at all forms. I mean, even in raw form, isn't it? And so it's hard to figure out. The question is, it seems to me, you should get the benefit of your settlement agreement. What's difficult is whether there is a factual issue in the settlement, in that language. So I agree with you, Your Honor. I think there's two questions here. One is, is the clause clear enough as a matter of contract interpretation to satisfy a promptu of time? There is a separate question, I think, once you decide that. Factually, right, on a case-by-case basis, well-by-well, you know, whether the costs we are taking are enhancing in that particular circumstance. But I think really the first question for this court is what does the clause mean? And is it clear enough on its face to satisfy a promptu of time? We think it is. Because it identifies a long list of post-production costs. It says when we can take them and when we can't. Is there an agreement in the industry of a cost to bring gas to marketing as distinguished from enhancement? Enhancement is beyond that, right? It takes gas on which some money has been spent to get it to be marketable. And then there is another expense you can put on that marketable product to enhance it, to increase the value and... Yeah, and I think, Your Honor, to answer your question, not to avoid it, but to answer it, I think it's answered by the clause. The clause says enhanced to receive a better price. And so I think that's what enhancement means under the clause. If the costs that were incurred get us a better price, and that's actually what we do. Again, that's a factual question, Your Honor, that if this court is uncomfortable with answering and looking at the record, can send it back to the district court. But I think as to whether the clause is clear about what it contemplates, I think this is what it contemplates. It contemplates that if the costs are enhancing a product beyond its marketable form, and forms and products are different things, if it enhances it beyond its marketable form, by that it means to receive a better price, then we can take the post-production cost deduction. And there's a definite list of what those things are. If it's only a cost that is incurred to get the gas into marketable form, and Your Honor, to answer your question, yes, sometimes raw gas is marketable, but sometimes it isn't, right? And it's all gonna depend on the facts of the particular market. Sometimes there isn't a willing buyer for the raw gas, and in that case, then it wouldn't be marketable. So, but that's what it does. It says, cost to get a product to marketable form, not deductible. Well, maybe enhancement is included in that. In other words, maybe there is no purchaser available except for enhanced. There may be, but again, I don't think there's a question as to what, I don't think it's ambiguous what marketable means, right? I think there's a willing buyer, that's what marketable means. Whether it's satisfied is a factual question. But what we really are interested in this court weighing in on is the district court's conclusion that she just couldn't make sense of what this clause is talking about. And we just don't think that that's true. We think it has two categories of costs. Cost to get a product to marketable form. Products are things like oil and gas, and things of that same level of generality. Condensate, sulfur, minerals, things that come out of the ground. And you can modify, refine, and process those products, right, and get them to a marketable form. All that stuff, not deductible. Once it's in a marketable form, anything else we do to get a better price, that's enhancing, those costs can be deducted. Whether that is true in a particular case is a factual question. We think the undisputed evidence here shows that we only took costs that were enhancing. But the more important question for this court, although setting aside the factual issue, which we think is undisputed, the more important question before this court is, is the clause clear? And we think it is. You can apply the facts, but I think what it means is not in dispute, and I think that clarity. Let's assume it's unclear, or let's assume it's ambiguous. We have a circumstance then where the default position is if you don't address post-production costs, then the lessee has to carry them. That's the Wellman principle. Yes, Your Honor. If it is addressed, then you can get post-production costs so long as there's some level of clarity that shows you're doing it. Now, there clearly is a settlement clause addressed at post-production costs. So it would seem that should get you into a new field. And the question then is that ambiguous,  And I guess the counter-argument is that Wellman or Taney, I'm not sure which one, has these three criteria, but those criteria are basically an effort to say it's gotta be clear you're addressing pre-production costs. I think that's what it boils down to. Your Honor, I'm sorry. I just noticed that I've gone well past my time. Chief, if I could just give a quick response here. Sure, go ahead. Judge Nemer, I think that's exactly right. I think in prong one is the question, does the lease address post-production costs at all? That is satisfied. No one disputes that. And prong three is this question of, is there a method of calculation? No one disputes if that's satisfied. The only question here is, have we identified the costs with sufficient particularity? And we think under Wellman, Taney, and Young, we have. And with that, Your Honor. Thank you, Mr. Lin. Master. Master. Please record. I make two requests. Maybe you could put the microphone on the desk there so it gets closer to you, and maybe move your mask just for an argument. Thank you. Yeah. I have a tendency to drop my voice after a while, so I'll try to keep it up. Well, if you really get in a problem, you can actually lift the mic up and put it on the stand there. Yeah, I'll go ahead and do that. I'll go ahead and do that. All right, well, in the last statement that was made, that defense counsel mentioned, was that everybody agreed that prong three was agreed that the lease, or the enhancement clause, passed that measure. This enhancement clause, and if you don't mind, I'll address that first. This enhancement clause was added to a contract that provided that these various deductions, post-production, could be taken. Those statements in that lease, the original lease, and that's the ones that were part of the settlement agreement that everybody had to re-sign. The reason for that enhancement clause was to address, in a different way, the right to take deductions. So what it really does, it starts off by saying that they will not take any deductions. It doesn't say we may, might. It says we will not take any deductions for all these things, all the way from the wellhead, all the way out to the point of sale, transportation, everything. And to make it marketable. Now what is it that that clause says? It says we will do this without post-production costs for oil, we'll do it for gas, and we'll do it for other products. If the defendant, in this case, Ontario, which is a very successful big production, gas company, then if they wanted to take deductions from NGLs, they have not said that. So why did they put in other products? What other products, besides oil and constituents and things of that nature, but why? The main thing, one of the main things they produce is NGLs, so why wouldn't they put it in there? What's clear about calling other products, if you're gonna come back later, and say, well, we really meant to leave out NGLs. And that's what they say in their brief. We really didn't mean to mean that this included NGLs. Now, then they come back and say, however, if we enhance a product, we enhance oil, gas, for other products, then we get to take deductions. So what does that tell an ordinary, reasonable human being, person, if they're been talking about the fact they're not gonna, they don't want deductions from their lease, from the products taken from their well. What does that tell them? I understand that. They only want it when it's been enhanced. Yeah, pardon? They only want to do it when it's enhanced. They're telling you what we're not gonna do, the normal type things they lay out. We're not gonna take that. But when we enhance, we will. That's what they're talking about. Okay. But if they say they're going to do that, for if they say they're going to process it, transport it, market it, and sell it, and we put it in marketable form, they're saying they're gonna put NGLs in marketable form. So it is not, this enhancement clause is not simply to, it's modifying a lease. In that lease, it has them taking these different deductions. But in this enhancement clause, they are saying, well, we'll go ahead and do this. Now, they're coming down and saying after that, that if we enhance these same products, which are marketable, what'd they say? Which includes NGLs, but if it's marketable, that means they have put it in a marketable condition. Like you sell a sweater, it's ready to be marketable, but if you enhance it by putting stitched embroidery on it, then I've enhanced it. True. So that's not. You're talking about a sweater, but. We're talking about all two. It's marketable is short of enhancement. Enhancement is marketable plus. But. Right, would you agree with that? Well, once you get NGLs in a marketable condition, they are marketable at that point. So that means. They're not necessarily enhanced in terms of the industry. They're not. For example, you know, you can market unleaded gases, whatever, but if you make it super supreme, then you've enhanced it some degree. That's why you look at a gas pump, you pay more for that. But that doesn't mean it wasn't marketable before that point. But NGLs are, they're made marketable and they're ready to be sold. So that's what it means. So the fact that they go back and say, you know, we will enhance this. If we enhance this, that means after it is put in marketable form, ready to be sold, then we're going to do something else. Well, they're not talking about. They're not paying for the NGLs at that point without taking deductions, I think, is what I'm trying to get across. In other words, once it's made in marketable form as NGLs, it is ready to be marketed and sold at that point. And it is sold at that point. So if they do something after that, for example, if they transport it to Chicago as NGLs, like they did their gas, sometimes they would do that. We're not arguing about that because they sometimes would transport their natural gas to other locations and they charge for that extra and sometimes charge a plaintiff. They do not charge a plaintiff for that unless the gas is, unless the transport fees makes the royalty less than what they could get back in selling it locally, I guess is the best way to put it. But in any event, we're not contesting that part. That's where that gas is enhanced because they're transporting maybe to Chicago. So plaintiffs are not contesting that. But that's not what, it's confusing what they mean. If they meant to say that and make it clear, then why didn't they just say, like Tawny requires, to, if we turn gas into NGLs, that's what they wanna charge. If we turn gas into NGLs, we're gonna charge your percent royalty as costs for turning it from gas into NGLs, okay? So that's what's at issue here. And that's not clearly stated. If it had been clearly stated, then they would have, and like Tawny requires. Well, it seems to me it's harder for a reader, including us, to apply it to actual market conditions and product conditions. But that doesn't mean that we couldn't come to an understanding of the meaning. And if I understand that clause, and you can correct me, but if I can understand that clause, is the first part of the clause says, they cannot deduct expenses to make a product marketable. But they can deduct expenses for enhancing that product to increase its price. And that actually would probably benefit both them and the lessor, because the enhancement would raise it and they would get a larger, probably a larger royalty, even despite the enhancement costs. And then the enhancement costs have to be reasonable, have them actually expended and reasonable. Now, the distinction is when is a product first marketable and what is an enhancement? And a document doesn't say that. But it does make the distinction between when a product's first marketable and when a product's enhanced. And to that extent, it can be understood. I raised with Mr. Lin, the question is, is this a question of fact? What's included in products that are just brought to market and products that are enhanced? What is the enhancement? I mean, every time you move it through a process, you're doing some form of enhancement, even to bring it to market, make it marketable. So that to me is a little bit confusing, but there is an agreement by the lessors to pay enhancement fees. There's no question about that. And if there's an agreement to pay enhancement fees, your effort is to try to say, no, we don't have to pay enhancement fees because it's not perfectly clear. Well, the court, the district court found it ambiguous on the second prong, as counsel mentioned. But the enhancement provision did not help the plaintiffs in this case, the lessors. In fact, they basically got near none of the value of the NGLs. The expert, Mr. Reneke, and his, some of his reports. So you're pointing out that the agreement to pay, to allow the induction cost for enhancements, the cost use up the value of the increased value. Is that what you're saying? That's exactly right. But that was the agreement. I mean, the settlement agreement, it was reached in 2015. And whether it turns out to be perfectly good or not, it's not unconscionable. It's an agreement on who's going to bear certain costs. And that's what that settlement addressed. And as I understand it, and you correct me if I'm wrong, it purports to say that Antero cannot charge costs for making a product marketable. But they can charge the cost for enhancing a marketable product. Isn't that the way you read it? Yes, that's what I'm saying. I'm just adding to that. That they said that in the first paragraph of this clause. And they used the same language in the second. In the first, I mean, they're calling the first, first they're saying they can take enhancements out of this by taking these various deductions. And they will not charge them to make it marketable. And they're saying that we will make your NGL, or these other products, we'll make your NGLs marketable. But then they've been taking deductions. And there's a different procedure for them taking deductions. But anyway, they've been taking deductions from the NGLs. And the clients are not getting any benefit, or did not get any benefit from that. So anyway, we believe it is definitely ambiguous. Because two people can read that in different ways. And the fact of the matter is, if you take into account, it's modifying a lease, which allowed them to do the same thing. Which, this was supposed to modify that, so they couldn't do the same thing. Well, why don't you address that? It's interesting to me. If I understand their argument, and I'm talking about proceeds leases, these are leases that are not under the settlement. They're leases that provide for the payment of market value at the wellhead. And apparently, there's three or four of those leases. And so their argument is, if I understand it, that the market value at the wellhead can be determined from the actual sale price, or the market price, further down the line, by backing up the cost and getting to the market value at the wellhead. So that if a product can sell for $1 at the wellhead, if it's delivered, it's going to sell for $1.30. They say, we can subtract the $0.30 for transportation and calculate the royalty on the dollar. Is that their view? That's their view. They're relying on imperial colliery, the Fourth Circuit's decision, in that case, was decided when FERC was in, had jurisdiction with respect to prices and so forth. In that decision, one of the large issues in that decision was whether the lessee, the producer, had violated his responsibilities under the lease. So the lessor in that lessee was taking a position that there was no market at that time. There was no market, and there was no way to calculate the market value at the wellhead. So the lessor, who was trying to show the damages, said, well, the experts said, well, we can reduce that value by taking these costs. Well, that predated with Wellman and Taney. And in that case, it's entirely different, and the court did not consider the same issues as were existing in 2001, when Wellman decided that case, and in 2006, when the Supreme Court of West Virginia decided Taney. So let me ask you, do you see Taney as doing, Taney reaffirms Wellman, right? That's right. Well, it answered Wellman's questions, too. And because the question was left, Wellman was dealing with a proceeds lease. And somebody, I mean, it doesn't really say where it came from. Somebody had brought up the issue about market leases or other types of leases. And so, rightly so, the Supreme Court in Wellman addressed only the leases that were proceeds, because that's the kind they were dealing with. Taney came along after the experiences. And a lot of times, people who are making contracts and people who are trying to enforce contracts in courts, you try to interpret them and try to apply them. A lot of times, experience shows both the parties and if put before the court, the court, where the problems lie in different types of leases. Leases are supposed to be, interpreting a lease, it's supposed to be strictly construed, literally construed for the lessor, strictly against the lessee. And also, if a document is prepared, the contract is prepared by one party, then the party that doesn't do the preparation is entitled to the benefit of applying it if it's not clear in favor of the party that did not prepare it. So there's two issues there, the rules. But in Taney, there's two syllabus points in Taney that address or basically repeat Wellman. One of those syllabus points, which in Taney is syllabus point two, doesn't say anything in there about proceeds leases. It just says leases. Obviously, in Wellman, that's probably what they were talking about. But anyway, the Taney case specifically addressed with a class action. So it addressed numerous leases. And before it, before the Taney court was presented various objections by the lessee contending that the at-well leases should not be treated the same as proceeds lease. And the court, in its syllabus point, specifically held that at-well lease could be a proceeds lease. You could sell out the wellhead, couldn't you? Yes. There's no difference between mark. I mean, that's the point. Market value, there's no market anymore at the wellhead once FERP got out of that business. So the market is where it's sold. And so unless, I mean, here's the thing. But you have a lease, that's a good point. The market is where it's sold. And let's say it's sold two stations down or 30 miles away or whatever from the wellhead. The question is, what is the market value at the wellhead? And I thought we concluded you could compute the market value at the wellhead by subtracting the cost of getting it to that 30-mile point. The court. Am I wrong on that? Well, what the court had, that's the Imperial Collier case I was mentioning earlier. That basically what happened was the lessee was saying no. And the lessor said, but they were fighting over other bigger issues. They were fighting about did the lessee violate the terms of the lease in other ways and therefore would lose the right to the wells and so forth in that case. They're experts. I mean, all the court did in Imperial Collier is say, well, yes, you can do that. But that is not being applied in this case. But that's just deductions. I mean, what it says is what they're trying to do is say that's a formula for all leases. And that's not the case. I think the question, and this whole discussion has helped me some, I came in wondering what's the difference between market value and proceeds. And I gather the proceeds is an actual transaction where you receive the money, whereas the market value is determined by what is being sold for at a particular point. And so we have some leases here not subject to the settlement agreement. We have some leases here that provide for market value at the wellhead, right? Correct. So, but as your honor said, I mean, trying to distinguish that when the Taney syllabus point says that at the wellhead in similar language is not enough to, I mean, similar language being when he's got price. One of the leases had price, net of cost. And there's a type of leases that this rule, the three prongs of Taney applied to. And there is, I guess what I'm saying is Taney answered the question left. And anybody that questioned the Wellman decision, whether it applied to at the wellhead language, whether it applied to- That doesn't help us here, does it? The distinction is not at the wellhead, but whether it's proceeds at the wellhead or market value at the wellhead. And Wellman made a distinction between those, which I didn't fully understand. But I think I understand a little better today. I think you guys are in a different league. I don't know, you talk about these oil and gas leases that use all these terms, and fracturing gas, and distilling it, and NGLs, and marketing, and making them marketable, and yet raw gas can be sold if there's a market for it. And it's not easy to get your arms around it. Well, what defense is trying to do is ask this court really to rewrite or overrule Taney? No, we're not trying to rewrite, but we are trying to distill what the rules are for the different types of leases. I'm just saying if we have in one category the leases modified by the settlement agreement. And so we have to construe that clause and determine whether the district court was right on that. Then we have these leases that were not modified by settlement. And there are different types. Some that are market value at the wellhead, and some are proceeds. Proceeds are governed by a Wellman, clearly, right? Yes. And Taney answered the question about the other leases, because he did not distinguish. I looked in Taney. I couldn't find them addressing the distinction between market value and proceeds. That was the footnote in Wellman. I understand. Do you think it did? I think it did from the standpoint that it provided that at the wellhead, it didn't say at the wellhead in a proceeds lease, at the wellhead in a market value lease, at the wellhead in any particular lease. At the wellhead. Because they were talking generically. Yes. That includes both. Right. I mean, I think if they didn't want that, then they would have addressed it there and accepted market value out. But as the court mentioned earlier, market value at the wellhead is not any significant difference than proceeds at the wellhead, because if the market's out 10 miles down the road or something, that doesn't answer the question, because they're going to get the market value anyway. I mean, that's all they get in proceeds leases, whatever the proceeds are. So trying to limit that, the reach of Taney, is not Taney applied to basically all leases. And I think if you read it correctly, read it as it's written, it applies to all leases, oil and gas leases, with respect to the three prongs of the things that have to be in there, if you're going to charge the lessor with these costs. And that includes the cost of the leases. That includes method. That includes specificity. That includes all the three prongs in the Taney criteria. And the leases that they mentioned, I don't know how much time I have at the end. You don't have any time left. Well, let me just say that the Taney court left really no doubt. I mean, they're trying to say that market value leases are different. They're not at the wellhead. So in any event, the enhancement clause, as I mentioned, is, the court found it, ambiguous. And it can be read in more than one way. So I'll rest for the time being. Mr. May? Thank you, Your Honor. If I could, I'll start with the very last point about what Taney stands for. Syllabus 0.1 of Taney is the syllabus point that reaffirms verbatim syllabus 0.4 of Wellman. And that's the one that includes the proceeds limitation. So what Taney says is, Wellman is, of course, good law. And it establishes this rule for proceeds leases. It then answers the question, what does it mean to provide otherwise? Because Wellman says, there is a presumption, but you can provide otherwise. And then the question that Taney answers is, is the at-the-well language sufficiently specific in a proceeds lease? Because that's what Wellman was about. And the answer that they give is, no, it's not, Your Honor, for the reasons that we discussed earlier. Because you could have this mismatch between proceeds, where that sale occurs. And if you say, proceeds at the well, it's potentially very confusing. And that's why there has to be more specificity. And that's where the Taney factors come from. So that's what Taney is about. And so, Judge Niemeyer, to your point, at-the-well language could be used in a proceeds lease. And that's why the Taney factors exist. But we're talking about market value at the well. How you calculate that, I think, is acknowledged in Imperial Colliery. It's also acknowledged in the West Virginia Supreme Court of Appeals' decision in Leggett, where it talks about value at the well and how you can use the net-back method to get to value at the well. Now, to be very, very clear, Leggett was talking about that language in a statute. But it was doing the linguistic interpretation. It says, value at the well is not an ambiguous term to us. We think you can get that by netting back from the actual sale. The West Virginia Supreme Court, a couple of months ago, came down with another opinion. Does that add anything to the mix? So that's the Kellum decision, Your Honor. It reaffirms Wellman and Taney as good. So there was some question after Leggett. Yeah, Leggett tended to, they read it as criticizing this. There was a part of Leggett, not this part that I was just talking about, the value at the well. It was a different part of Leggett that said, we think Taney and Wellman were not well-reasoned. And Kellum says in the majority, no, we don't think that's correct. Wellman and Taney are still good law. But that's all it says. It doesn't say anything else. It doesn't touch this court's young opinion, which applied Taney. And it also reaffirms verbatim that language. What does Young add to that? Well, I think what Young adds is what Young said is when you read the plain text of Taney, that's the quote at 208, that it doesn't require Einsteinian precision. And that you only have to identify which costs and how much will be deducted. When reading the plain text of Taney, where in Taney does it say it's limited to proceeds leases? I think it's syllabus point one of Taney that reiterates. Syllabus points, they're not the opinion. They are, Your Honor. We cite the rect case. OK, so syllabus point which one? Syllabus point one. And it says? Limited to proceeds. It says, if an oil and gas lease provides for royalties by proceeds, comma, unless it provides otherwise. And then it goes on to state the presumption. Syllabus point one is a repeat of syllabus point four in Wellman. And Judge Fax, to be very, very clear, syllabus points are the law in West Virginia. It is different from? Who writes the syllabus? The court does. The court does. And they are required by Constitution to write. So they write their opinion and they write syllabus then? They do. And oftentimes, I'm glad we don't have to do that. We have to raise our pay. And Your Honor, I will just say from experience, oftentimes in an argument, you will get asked by the court, what is the syllabus point you would like us to adopt here? It's a quirk of West Virginia law. Can you cite an opinion? Can you cite a syllabus point? Absolutely. Does the court rely on that? Absolutely. In fact, you are. The syllabus points are more persuasive or binding than language explaining it in the opinion. It prohibits dictum, really. Right. Our West Virginia judge knows all that. Syllabus point one is quoting Wellman. Yes, Your Honor. And it includes that proceeds language. Right. Right. And so, and that's my point. So it reiterates the limitation to proceeds that Wellman had adopted and explained in footnote three. I'm rapidly running out of time. I will just simply on the settlement, the market enhancement clause, two very quick points. The first is, it is in fact undisputed that prong three and prong one were satisfied. The district court of JAA 2004 to 2005 says and holds, prongs one and three are satisfied, 2004, 2005. And my friend in his brief did not contest that. He has not challenged that holding. So the only question is prong two. And really what it boils down to, as Judge Niemeyer set forth, there's a question of, is the clause clear? And then there's a question of, what happens when you apply that language to the facts? And we freely acknowledge that where is that line between marketability and enhancement? When something becomes marketable is a factual question. And we think it's satisfied here, but it's a factual question. But the more important point here is, is the clause ambiguous? We don't think it is. The main question is, what does the phrase other products mean? And does that include? I don't understand why that's even a problem, one way or the other. Because if you delineate, if you're able to delineate costs that make a product marketable and costs that enhance it, if you can make that delineation and you've answered the whole clause and it doesn't matter, other products is basically, is not to limit the whole settlement to oil and gas. That's correct. That's exactly right. And it doesn't matter what's in there. It's question is, any product that is made marketable is included there. And enhancement is any product that is enhanced to increase its value. So the distinction is between making it marketable and enhancing, I think. That's the way I see it. Yes, Your Honor. And Chief Judge Gregory seemed to have said it. Plus, right? I think questions are a plus. And so I would say that the question is, it's about making a product into marketable form, right? A form. That's what it says, marketable form. And then enhancing it beyond that marketable form. That's what that clause means. And it's not ambiguous. And we think it satisfies problem two. Could be an Alice in Wonderland type thing, you know? It's a marketable form and enhancement may not be any different. I've exceeded my time. And so we'd ask this court to reverse the judgment for the plaintiffs and to, at a minimum, remain with instructions for the court to proceed consistent with your rulings. Thank you, Mr. Lynn. Mr. Masters? Your Honor, going back to what are you standing up rebuttal on? You only have rebuttal on the fraud issue. I'm sorry. I was getting ready to address the fraud, if that's what you mean. All right. So the issue with respect to the fraud is, or the fraud cause of action, it was alleged, is that the court dismissed that early on based on the complaint. And by doing that, then the plaintiff was not put in a position where that was dismissed. So therefore, we were limited in our discovery with respect to that. What was presented and our plaintiffs relied upon in terms of their products? They were initially brought to suit against by Interro in a petition suit. And they ultimately ended up signing a lease or leases modifications with respect to their property. And one of those issues was they were discussed. And as they understood, resolved by the settlement agreement and the lease they signed, was that there would be no deductions taken, including on the in-jails. So our complaint obviously didn't go into any details, but didn't have any details. And I pointed out in my briefing. Let me ask you this. If that's the allegation, apparently they understood that there'd be no deductions made, and they signed this settlement agreement. And the settlement agreement says there will be no deductions made except for deductions for enhancement. Well, that goes back to. That's in writing. And the question is, doesn't that override any claim for fraud, or undermine any claim for fraud that they thought they were going to pay no expenses? The enhancement clause, it goes back to what I explained to the court in the previous argument. The fair reading of, I understand what you're saying about the enhancement. It has to provide for something. I mean, it makes an exception for enhancement expenses, right? It does, but then again, what are they enhancing? I mean. Well, that's a good point. But my point is, they could hardly say they were going to be no expenses across the board ever. They agreed to say no expenses to make it marketable, but they agreed to deduct expenses for enhancement. Now, I don't know if they asked what enhancement meant when they were negotiating. Well, I mean, that's part of the reason that the board. But it's hardly fraud, is it, at that point? At that point, it violated, clearly violated, tawny, violated. I mean, everybody's sitting there looking at it. You have different understandings of what was agreed to, but the language is there, and everybody signed it. It is. I mean, I think everybody agreed. They agreed to make marketable other products. If they had just said oil and gas, stop there, then everybody would have understood. If you process the gas and turn it into NGLs, then that might be enhancement. You know, going back to why in the world would Antero limit their enhancement clause to two little paragraphs? The lease is several pages. Why would they, if you're going to modify the lease, why would they prepare that? They prepare that. And why would they start out saying, we're not going to charge you for making all these things marketable? Well, they make NGLs marketable. I know, but I understand. We're getting back to what that means. But the question is, where was anybody misled by keeping up with what you argue is ambiguous language when you were negotiating with Antero, through your attorneys, on that clause? Because our clients believed there were not going to be any deductions for NGLs. They believed that. They believed that when they signed that, that modified the lease so that there would be no deduction. No deductions with respect to the NGLs. And so when they didn't, well, if that's what the contract means, then they're breacher of it. But at this point, it doesn't mention NGLs. And somebody has to determine, as a matter of fact, whether NGLs falls under the making the product marketable or whether it's an enhancement, right? Right, but I don't think there's any factual issue. What they did was, they did not enhance the NGLs. They did not do that. You could say they enhanced the gas. Let me ask you, just as a matter of a side thing, is an NGL gas that comes from the well that's compressed to make it liquid? Well, they go through a processing of the gas, and they turn that into it. It's liquids from the gas that's contained in the gas that's transported. Usually, it has a higher BTU value than the gas that gets on the interstate pipeline. So they run it through processing. And some of it has to be processed anyway. So it runs through there, it's fractionated, and turned into NGLs. And that's a market. That's another product from the same thing that comes out of the gas when they make oil, gas, and NGLs. It's all coming from these plaintiffs' properties. And the plaintiffs are entitled, they're entitled to their royalty from that without deduction for one thing. According to Taney, if that lease doesn't clearly say that, then they're not entitled to take deductions. And like I said, why would a big company prepare a clause, an enhancement clause, that's not at least clear enough to say in it, we're going to take deductions out of the NGL from if we produce NGLs from gas, we're going to take deductions. Why wouldn't they say that? I'm not sure we might not have been here. We wouldn't be here. And that's the point. That's what contracts are supposed to be. They're supposed to be to avoid disagreements over it. And your lawyer could have said, what does enhancement mean? You brought us to the table too, didn't you? I'm sorry? You're saying they didn't do the, why does a big company do this in two paragraphs and all of that? They had lawyers. Your client had lawyers. No, it's not saying enhancements. I don't think there's any question. Our clients, you could have said enhancements such as NGLs. Could have said that. They could have said, we're taking NGLs. Or you could put other products such as enhancement. In other words, you could have, if NGLs was the real important issue at negotiations, it could be put in as an example in either products or enhancements. Yes, according to, yes, it could. We wouldn't be here. We wouldn't be here on this case, no. Might be another case, but we wouldn't be here on this case. So what I'm saying is it's really insane to think that we are here talking about this. It really is. Because all they have to do is put it in. Also, as Maxwell said, a law won't do for you what you won't do for yourself. Yeah, it says that. It says that. You sit at the table, you could have done this for yourself. I wasn't going to. It says you're supposed to rewrite the contract. No, I'm not suggesting that you rewrite the contract. I'm trying to tell you, or tell the court, that this clause does not meet TANI by any stretch. I don't agree that it meets TANI in any way. I don't. And like I said, I think, as it's put in my brief, I think that the way it's written, they're not allowed to take deductions on NGL. You think an NGL is not an enhancement? Not in this case? No, I think generally. It can be. Oh, absolutely it can be. I mean, I've seen contracts written. Well, that makes it even harder for us. Well, the point I'm making is that our clients, not my clients then, because I wasn't involved in this, but anyway, I've seen many enhancement clauses. I have never seen one like this. This is a misleading. It's misleading. Because if they want to. It's associated with attorneys, though. I don't know who the negotiator was. Well, they signed it. I saw that. They signed it. So I don't want to say they, it would have been nice if they would have been a little more explicit, but sure, we wouldn't have this case here. But every contract case usually ends up that way. Somebody didn't say something that maybe could have been said. I don't think this boils down to my clients. Those are more elderly people. Well, it may or may not. It depends what the contract says. It should depend on what the contract says. But according to Tawny, it has to be specific. This doesn't mean specificity. This doesn't mean particulars. This doesn't mean anything in Tawny, to tell you the truth. The court found prong two as not being according to prong two. But if you read the court's full opinion, she went through very particularly and looked at every aspect of that clause. And she found each, she went through each, she went through each lease specifically. Yeah, you're back arguing the other part. Well, she found against you, didn't she? The court found against you on her cross appeal, right? That's why you cross appealed. But she ruled before. We're finished on that case. You came back up because you're saying, telling us why it is fraud. That's true. I'm sorry. Yeah, you did. All right. So anyway, let me sort of finish up how this happened that I consider to be fraud, OK? What they did was they did not advise the plaintiffs here that they were going to compare. First of all, they didn't advise them they were going to take deductions. It was hidden in there. And according to the way that our clients believed that, they're ordinary people. They believe that this fixed the leases, which had already said they were taking these deductions. They thought this fixed that. So and what they would do and did was they did a, they called it a balancing between the value of the gas and the value of the NGLs with residue gas. There's gas left over. So those two things, they were balancing that. And they pay on the better price. The problem was that all this time they were taking deductions off of the NGLs. And that did not, that was learned in the litigation. They treated the NGLs as an enhancement. They did. They did. And that's where the problem is, the biggest part of this case is that they did that. So the fraud part is they misrepresented that, that they were going to do that. And the enhancement clause, I believe, was one thing that misled them. And so anyway, I have a lot of arguments in my brief, which I won't try to go to because of the time. Thank you, Your Honors. Thank you, Mr. Masters. Mr. Linden, both of you, thank you for your arguments. Can't come down and shake your hands, but know that we appreciate your arguments and presence. We wish that you be well and be safe with that. We'll ask the clerk of the court to adjourn the court court today. This honorable court stands adjourned. Signed and died, God save the United States and this honorable court.
judges: Roger L. Gregory, Paul V. Niemeyer, Stephanie D. Thacker